IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JAMES TOLLEY,                )
                                   )
       **Plaintiff,**        )
                                   )
**v.**                               )       **Civil Action No. 3:08-cv-0075**
                                   )
**THE TENNESSEE VALLEY AUTHORITY**   )       **Senior Judge Thomas A. Wiseman, Jr.**
**BOARD OF DIRECTORS,**         )
                                   )
       **Defendant.**       )

## MEMORANDUM OPINION

Plaintiff James Tolley brings this action against defendant Tennessee Valley Authority Board of Directors (hereinafter, "TVA"), asserting claims of disability discrimination in violation of the Rehabilitation Act of 1973, 29 U.S.C. § 794. Specifically, Tolley alleges that TVA discriminated against him by removing him from training for a "Level III" position at TVA and by "forc[ing] [him] to sign a document stating that he would accept a Level II position or be fired." (Am. Compl. (Doc. No. 14) at ¶¶ 6, 9.)

Now before the Court is defendant TVA's Motion for Summary Judgment (Doc. No. 18) asserting that it is entitled to judgment in its favor as a matter of law on the basis that Tolley is not "otherwise qualified" for the position he seeks and that he was not subject to any actionable coercion. For the reasons explained below, the Court will grant the defendant's motion.

## I.    FACTUAL BACKGROUND[1]

TVA is the country's largest provider of public power. It operates the Cumberland Fossil Plant ("Cumberland") in Stewart County, Tennessee, which produces electricity through two coal-fired turbo-generating units. Cumberland produces more power than any other TVA fossil-fuel plant. It consumes approximately 20,000 tons of coal per day and, in 2004, generated about 18.5 million megawatt-hours of electricity, enough to supply almost 1.2 million homes.

---

[1] Pursuant to the local rule concerning the concise statement of material facts that is to accompany any motion for summary judgment, "[e]ach fact shall be set forth in a separate, numbered paragraph. Each fact shall be supported by a specific citation to the record." L.R. 56.01(b). The Court observes that the defendant did not comply with this rule, insofar each paragraph in its Statement of Material Facts (Doc. No. 20) contains a narrative of numerous facts rather than one fact, not all of which are actually material to the present motion. Plaintiff, however, has not raised any objection to the format of the defendant's statement.

From the 1930s until approximately 2000, trades and labor work at TVA was performed by craft employees who historically maintained separate, distinct and traditional jurisdictional lines between the types of work done by each of the crafts. In the late 1990s, TVA determined that the efficiency of its maintenance work at its operating plants was impeded by the requirement that it assign maintenance and operating work based on strict craft jurisdictional divisions. TVA recognized that performance of cross-craft multiple-skill tasks would improve its efficiency as well as help it and its craft employees remain competitive. In 2000, TVA began transitioning from traditional craft classifications to new multiple-skill job classifications for certain TVA operating and maintenance craft employees at its power plants, including Cumberland. Under the new system, a maintenance employee working as machinist in a fossil-fuel plant would receive training in skills traditionally performed by boilermakers, pipefitters and electricians. Upon successful completion of the Multi-Skill Training ("MST") program, a qualified employee would be capable of single-handedly performing tasks that under the old craft system might have required several employees each qualified in a different craft.

Craftsmen employed by TVA in operating and maintenance positions as of November 3, 2000 ("current employees") were offered the opportunity to receive additional training through the MST program. "Current" employees who could not or chose not to participate in the MST program were classified as Level II Technicians and continued to be paid a wage rate of 100% of the former journeyman level wage, while current employees who successfully completed MST were classified at the level of qualification attained, Level III or Level IV Technicians, with a wage premium of 5% or 10%, respectively. Individuals hired by TVA into maintenance and operating craft positions after November 3, 2000, however, are normally required to progress to Level III, at least, as a condition of continued employment. In other words, they are required to move "up or out." (Boggs Decl. (Doc. No. 22) at ¶ 3 and Ex. 1 (Doc. No. 22-1), at n.1 ("Up-or-out refers to the requirement in the respective MOU [Memoranda of Understanding] that individuals hired external to TVA or from an internal TVA organization under a different MOU are required to complete multi-skill training through Technician Level III or be terminated.").)

The MST program includes an individualized training curriculum pursuant to which new hires first undergo a training-needs assessment to ascertain what training they must complete in order to achieve

Level III classification. The training-needs assessment consists of a self-assessment questionnaire, written exam, technical interviews and selected task qualifications. Based on the results of the assessment, the trainees are given an individualized training curriculum consisting of computer-based training modules, self-study modules, related classroom training, task qualification, and work experience. (Doc. No. 22-1, at ¶¶ 5–8; Rodenhaber Decl. (Doc. No. 21) at ¶ 4.) Once the training requirements have been met, and before promotion, each participant must complete a comprehensive written and "walkdown" examination. ((Doc. No. 22-1, at ¶ 11.) Once that hurdle is passed, the participant is promoted to the classification of Level III Technician, with a corresponding wage increase.

The primary function and duty of a Level III Technician is to perform routine maintenance and emergency repairs on a variety of plant equipment including piping, pumps, motors, fans, pulverizers, condensers and steam turbines. Level III Technicians at Cumberland work and operate in an exceedingly hazardous environment, as they are required to work on highly energized rotating equipment, at heights and in confined spaces, in close proximity to high temperatures (around 1000 degrees Fahrenheit), high pressures (up to 3650 pounds per square inch), and explosive, poisonous and otherwise dangerous gases (including hydrogen, carbon dioxide and ammonia). According to TVA, Level III Technicians are often required to work by themselves and with little or no supervision. When a Level III Technician is assigned to perform a specific task, he is given a detailed written work package setting forth the procedure for performing the task at hand which must be followed precisely, step by step. In addition, Level III Technicians are required to be able to read and understand manufacturers' diagrams, instructions and manuals as well as written instructions on equipment and parts, operating standards, checklists and safety regulations. The safety of individual employees, their co-workers, and plant equipment depends on the ability of each employee to perform his or her job in a safe manner. TVA maintains that a Level III Technician's ability to read a work package and perform work in accordance with the step-by-step procedure and other written instructions is critical, and his failure to properly follow procedure could potentially injure employees and/or cause units in the plant to shut down, thereby costing TVA significant amounts of money in lost revenue (up to $1.3 million per day), or causing a Reportable Environmental Event. (Doc. No. 21, at ¶ 3.)

TVA policy expressly states that "TVA will **not** pay a premium for employees who cannot perform

the essential functions and meet the physical requirements of the new multi-skilled classifications." (Doc. No. 22-2, at ¶ 7.) The policy requires that employees with restrictions or limitations be evaluated in order to proceed with the MST program to determine whether they can safely and efficiently perform the essential functions of the multi-skilled positions. (*Id.* ¶ 3.) As indicated above, "current" employees who are not allowed to proceed with MST because of restrictions or limitations, like those current employees who choose not to participate in MST, are classified at Level II. New hires (post November 3, 2000) who are unable to proceed with MST to Level III are subject to termination.

To ensure consistent decisions and appropriate consideration of all relevant aspects of each employee's situation, TVA established a Workplace Evaluation Team ("WET") to evaluate employees with restrictions or limitations on an individualized basis and to make recommendations to management. The WET evaluates an individual's ability to perform the duties of the individual's position given the employee's specific limitations. If the individual is incapable of performing the essential functions of the job at issue, the WET determines whether there are other positions available where the individual can work within his or her limitations.

Plaintiff James Tolley was hired as an annual (non-permanent) Level II Mechanical Maintenance Technician at Cumberland in 2005. Consistent with TVA's MST requirements for all maintenance and operations personnel hired after November 3, 2000, a condition of Tolley's continued employment was that he progress to a Level III Technician. (*See* 2/28/2005 Offer Letter to Tolley from TVA (Doc. No. 22-3).) As Tolley began progressing through the MST program, however, his manager, Clay Cherry, learned that Tolley was having difficulty with the program's required written and computer-based tests because of deficiencies in his reading and writing skills. In a discussion with Cherry, Tolley admitted that he was unable to read.[2] In May 2006, after learning about Tolley's reading and comprehension difficulty, TVA management sent him for a "Fitness for Duty" evaluation of his ability to work safely. The evaluation confirmed that Tolley needed assistance in reading comprehension.

Tolley also provided TVA with information from an optometrist and a psychologist who had evaluated him. Dr. Premeau, psychologist, confirmed that Tolley was able to read and write at only the

---

[2] Prior to that point, Tolley had been getting help from his wife at home—she was typing his communication projects for him, and reading the computer-based training examination questions aloud to him and typing in his answers. He had apparently also been receiving some assistance from co-workers while doing on-site training.

1st-grade level,\ and therefore assessed him as having a "severely compromised" ability to learn new information through reading or to be evaluated on that information through read/writing formats. Dr. Premeau also found that Tolley had an average ability to listen and comprehend information. The optometrist diagnosed "a condition of binocular motor dysfunction . . . secondary to convergence insufficiency," which condition can "cause learning disabilities and is most likely the cause for [Tolley's] having difficulty learning to read." (Doc. No. 22-3, at 1.)

Tolley also underwent an evaluation by the WET of his condition and limitations in comparison with the requirements of the MST program and the Level III Technician position. In its written report dated July 14, 2006, the WET noted that Tolley had taken classes to try to improve his reading skills and that he was able to read some diagrams and follow oral instructions. The WET also determined, however, that Tolley was not able to read drawings about electrical wiring, charts, or schematics, and that the Level III position at Cumberland "require[d] a much broader range of duties than the Level II." The WET, recognizing that Tolley had expressed a preference for remaining employed at Cumberland, recommended that Tolley remain employed in Cumberland's machine shop as a Mechanical Level II Technician, subject to certain restrictions including: "1) He must always work with someone; 2) when he gets to a point on a job where some reading is required, he must get someone to assist him; and 3) management will ensure the foreman understands these requirements." (Doc. No. 22-4, at 2.) The WET also recommended that management document Tolley's understanding of these restrictions and acceptance of the recommended position by having him sign a letter acknowledging as much. (*Id.*)

Based on the WET's recommendations, TVA management agreed that Tolley should be offered the opportunity to remain at his Level II position with the proposed restrictions. In other words, TVA agreed to accommodate Tolley's learning disability by waiving the "up-or-out" requirement that applied as a general rule to all hires after November 3, 2000. Tolley met with Clay Cherry and other members of his direct supervisory team sometime in late July 2006 to discuss the results of the WET's evaluation. At that point, TVA offered to allow Tolley to continue his employment as a Level II Technician as an alternative to termination. The reasons for requiring Tolley to stay at the Level II position were explained to him, and a draft letter explaining the offer and his options was given to Tolley. Tolley was allowed to take the letter home and discuss it with his wife. A week or so later, management pressed Tolley for a decision and

then agreed to meet with Tolley again, this time with his wife in attendance. At that meeting, Tolley's wife asked questions and expressed some concerns about the letter, and TVA made some revisions to the letter at her request. (*See* Cherry Sworn Affidavit (Doc. No. 25) at 9–10.) After those changes were made, Tolley signed the letter, agreeing that he would remain at the Level II position with certain restrictions. (See 8/8/2006 Letter from C. Cherry to J. Tolley, signed by Tolley (Doc. No. 22-4).) Among other things, the letter specifically states TVA's conclusion that Tolley's inability to read and write prevented him from performing the essential job functions of the Mechanical Technician Level II [sic] position,[3] and that he therefore was not approved to participate in the multi-skills training program. Instead, he was approved to remain in the journeyman Mechanical Technician Level II position with the above-referenced restrictions. The letter also states that Tolley would have three days to decide whether to accept the position offered.

Tolley, when questioned in his deposition, conceded that the above-referenced series of meetings occurred and that he was allowed to take the letter home to his wife and then meet again with management, with his wife in attendance, before he signed the letter. (Tolley Dep. at 33–36.) However, Tolley claims he felt "forced" to sign the letter because his Union steward approached him regarding the letter and told him he had three days to sign the letter or be terminated. For purposes of this motion, TVA does not deny Tolley's version of events.

Otherwise, Tolley admits that he cannot write or read. He also does not dispute that the Cumberland plant is an exceedingly dangerous work environment and that his inability to read even the simplest of danger and caution signs within the plant makes it unsafe for him to venture into the plant by himself. However, he disputes TVA's claim that reading and writing are essential job requirements of the Level III position. In support of his position, he claims to have been "performing Level III work ever since the beginning of his employment," and asserts that at least one other employee, Dwight Phillips, was permitted to progress to a supervisory position despite being unable to read or write. Tolley also insists that it would was unreasonable for TVA not to agree to assist him in taking the MST program tests by providing someone to read the questions to him, explain the questions, and then write down or enter his

---

[3] The context of the letter suggests that the reference to Level II was an error; it likely was intended to state that Tolley's inability to read and write prevented him from performing the essential job functions of the Mechanical Technician Level **III** position.

verbal responses and, once he is promoted to Level III, to provide a similar accommodation in any situation requiring him to read. Despite his acknowledgement that his inability to read makes it too dangerous for him ever to go into the plant by himself, he argues that this limitation is not problematic because technicians are always dispatched to work in teams. For the same reason, he contends it is not material that he is unable to read a work package, since most of the work is performed by teams such that someone else on the team could always read and explain the work package to him.

In response to these arguments, TVA points out that Dwight Phillips retired from working for TVA in 2000, prior to the adoption of the MST program or the multi-skilled classifications. He therefore never underwent multi-skill training and was never classified as a Level III Technician and therefore is not qualified to talk about the position's essential functions. In addition, in response to Tolley's claim that Tolley himself has been performing Level III tasks since he began his employment and that he is capable of learning other skills required of Level III Technicians, TVA has demonstrated that Level III Technicians have all the skills and can perform any of the job duties typically assigned to Level II Technicians, such that any task that Tolley as a Level II Technician might be required to perform could also be performed by a Level III Technician. However, Level III Technicians have received training in other crafts and have a broader set of skills than Level II Technicians. Consequently, they can be assigned to perform tasks that are outside the range of what Level II Technicians have been trained to do. TVA contends that Tolley has been able to do the work asked of him because he has been given assignments that are consistent with his classification and training, but that Tolley has never performed the full range of the duties of a Level III Technician and is not capable of doing so given his inability to read, understand and follow a work package independently. Finally, in response to Tolley's claim that technicians never work alone, TVA concedes that Tolley, who is not a Level III Technician, has never been assigned to work alone in the plant. TVA maintains, however, that Level III Technicians are trained to perform a wider range of tasks and are at times assigned to work alone and without direct supervision, particularly on overtime, nights, weekends and holidays. TVA also points out that prior to the advent of multiple-job-skills classifications, employees often worked in pairs or crews so that all of the necessary skill crafts would be present at the job site. Since Level III Technicians are now cross-trained, it is often not necessary to send more than one technician to perform a given assignment. Finally, according to TVA, when working in pairs or larger

groups, a Level III Technician must be able to act as the lead on a task in that Technician's core craft, which includes being able to read and follow the written work package.

In any event, since signing the August 8, 2006 letter, Tolley has continued to work for TVA at Cumberland as a Level II Technician. In the interim, he filed a timely administrative complaint alleging discrimination under the Rehabilitation Act and received a Final Agency Decision concluding that he was not the subject of disability discrimination. The EEOC affirmed the Final Agency Decision. Tolley filed this timely action on January 24, 2008.

## II.    STANDARD OF REVIEW

In reviewing a motion for summary judgment, this Court will only consider the narrow question of whether there are "genuine issues as to any material fact and [whether] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A motion for summary judgment requires that the Court view the " 'inferences to be drawn from the underlying facts . . . in the light most favorable to the party opposing the motion.' " *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). The opponent, however, has the burden of showing that a "rational trier of fact [could] find for the non-moving party [or] that there is a 'genuine issue for trial.' " *Matsushita*, 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of plaintiff's position[, however,] will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). If the evidence offered by the nonmoving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the nonmoving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249–52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 430 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247–49).

## III.    ANALYSIS AND DISCUSSION

The Rehabilitation Act, 29 U.S.C. § 794, which applies to government agencies, otherwise basically incorporates the standards of the Americans with Disability Act ("ADA"). *See* 29 C.F.R. § 1614.203(b) (2008) (expressly adopting the ADA regulations as the standard to be applied to discrimination claims asserted under the Rehabilitation Act). Thus, cases construing the ADA are

generally instructive for purposes of construing the Rehabilitation Act. Under either statutory scheme, in order to establish a *prima facie* case of disability discrimination a plaintiff must show that (1) he is an individual with a disability within the meaning of the Act; (2) he is "otherwise qualified" for the position at issue; and (3) he was excluded from a job or otherwise suffered an adverse employment action solely by reason of his disability. For purposes of the Rehabilitation Act, a plaintiff must also show that his position was part of a program or activity conducted by an Executive Agency. *Andrews v. Ohio*, 104 F.3d 803, 807 (6th Cir. 1997). It is not enough for the plaintiff to show that his handicap contributed to the adverse employment action, because the Rehabilitation Act "does not forbid decisions based on the actual attributes of the handicap." *Pesterfield v. Tenn. Valley Auth.*, 941 F.2d 437, 443 (6th Cir. 1991) (quoting *Anderson v. Univ. of Wis.*, 841 F.2d 737 (7th Cir. 1988)).

Assuming that the other elements are met, in a case such as this where the defendant admittedly "made the decision because of the handicap . . . the sole factual issue left for resolution is an objective one—whether the plaintiff is qualified for the position or program despite the handicap, with or without reasonable accommodation." *Burns v. City of Columbus*, 91 F.3d 836, 842 (6th Cir. 1996). In other words, the second and third elements of the claim collapse into one question, because if a plaintiff can show that he is otherwise qualified, it will be virtually impossible for the employer to show that the failure to promote was not solely due to the handicap. *Crocker*, 207 F.3d at 319.

Further, where the defendant admittedly relied on the employee's disability in making an adverse employment decision, the plaintiff bears the burden of proving either that he is "otherwise qualified" despite his disability either (a) without accommodation; (b) with the "essential" job requirement eliminated; or (c) with a proposed reasonable accommodation. A plaintiff "bears the initial burden of proposing an accommodation and showing that that accommodation is objectively reasonable." *Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 870 (6th Cir. 2007) (quoting *Hedrick v. W. Reserve Care Sys. & Forum Health,* 355 F.3d 444, 457 (6th Cir. 2004)). If the plaintiff meets that burden, the defendant then bears the burden of proving that the challenged job criterion is in fact essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship on the employer. *Hedrick,* 355 F.3d at 457; *Monette v. Elec. Data Sys. Corp.* 90 F.3d 1173, 1186 (6th Cir. 1996).

In this action, Tolley argues that TVA discriminated against him in violation of the Rehabilitation

Act when it (1) removed from the MST program and did not allow him to advance to a Level III position; and (2) forced him to sign a document stating he would accept a Level II position as an alternative to being terminated. For its part TVA concedes for purposes of this motion that Tolley is disabled within the meaning of the Act[4] and that TVA is an Executive Agency whose conduct is subject to the requirements of the Rehabilitation Act. It contends, however, that Tolley was not "otherwise qualified" to continue with MST training or to become a Level III Technician, with or without a reasonable accommodation. TVA also argues that it offered a reasonable accommodation to Tolley when it permitted him to remain permanently employed as a Level II Technician rather than being terminated under TVA's "up-or-out" policy, and that Tolley was not "forced" to accept that position.

A.     Tolley Was Not "Otherwise Qualified" for the Multi-Skills Training Program or the Level III Position

In order to establish that he was "otherwise qualified" for the position sought, Tolley must show that he can perform the essential functions of that position, with or without a reasonable accommodation. 29 C.F.R. § 1630.2(m) (2008). The applicable regulations define "[e]ssential functions" as "the fundamental job duties of the employment position the individual with a disability holds or desires. The term 'essential functions' does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n). Although it is clear the plaintiff has the burden of establishing that he is "otherwise qualified," the defendant has the burden of establishing what functions of a job are essential.

The Sixth Circuit has recognized that the applicable statutes and their enforcing regulations provide guidelines for determining if a given function is truly "essential." *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998). The ADA itself specifically states that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). Further, the implementing regulations enumerate seven non-exclusive factors to weigh in determining if a function is "essential," to wit:

---

[4] The Rehabilitation Act defines an individual with a disability as a "person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has record of such an impairment, or (iii) is regarded as having such an impairment. 29 U.S.C. § 705(2)(B) (2000).

(1) an employer's judgment that the function is essential;

(2) written job descriptions;

(3) the amount of time on the job devoted to performing the function;

(4) the consequences of not requiring the employee to perform the function;

(5) terms in a relevant labor agreement;

(6) the work experience of those who have held the position in the past; and

(7) the current work experience of those who hold similar jobs.

*Brickers*, 145 F.3d at 849 (citing 29 C.F.R. § 1630.2(n)(3)). "The inquiry into whether a function is essential is highly fact specific." *Hoskins v. Oakland Co. Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000) (citing *Brickers*, 145 F.3d at 849). "Such a determination should be based upon more than statements in a job description and should reflect the actual functioning and circumstances of the particular enterprise involved." *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1079 (6th Cir. 1988). However, courts are not precluded from resolving a summary judgment motion on the basis of such a fact-specific determination when the evidence before the court pertinent to essentiality does not conflict and the non-moving party has failed to create a genuine issue of material fact as to that issue.

In this case, Tolley's primary complaint appears to be that TVA failed to accommodate him by providing him with assistance in taking the written and computer-based tests required by the MST program. Tolley focuses only indirectly on whether he would actually be able to perform the essential functions required of a Level III Technician once he made it through the training program, and what type of accommodation would be required at that point. In fact, the validity of Tolley's claim relating to the training is entirely dependent upon whether TVA appropriately determined that Tolley would not be capable of performing the essential tasks required by the ultimate job position he sought—that of Level III Technician. This is so because requiring TVA to use limited training resources on an individual who would ultimately be incapable of performing the tasks required of the position for which he was being trained would serve no useful purpose. In that event, the costs of such a requirement would "clearly exceed its benefits." *Wilburn v. Lucent Techs., Inc.*, No. Civ.A.3:98-CV-2581-L, 2000 WL 1772670, at **5 n.15 (N.D. Tex. Nov. 30, 2000) (rejecting plaintiff's claim that her employer violated the ADA by failing to allow her to train for the position sought when it was clear she could not perform the essential functions of

that job; quoting *Borkowski v. Valley Cent. Sch. Dist.*, 63 F.3d 131, 138 (2d Cir. 1995)).

Consequently, this Court's analysis must focus on whether Tolley was "otherwise qualified" to be a Level III Technician, that is, whether he was capable of performing all the essential functions of that job. Only if the answer to that question is "yes" would the Court then need to consider whether TVA incurred an obligation to provide a reasonable accommodation that would permit Tolley to complete the training for the Level III position. In that regard, although TVA has not presented evidence of written job requirements for the Level III position,[5] it has presented ample and unrefuted evidence that the ability to work safely in the Cumberland plant is an absolutely essential job requirement of the position of Level III Technician. Tolley himself has conceded that it would never be safe for him to go into the plant unaccompanied because of his inability to read the various caution and danger signs that are prevalent within the plant. TVA has also established that a Level III Technician is required to be able to work independently and in accordance with the detailed written instructions set forth in a work package that accompanies each task, and that the procedure set forth in the work package must be followed precisely, step by step. Tolley is admittedly unable to read or follow the instructions in a work package, and therefore would never be capable of performing the full range of tasks required of a Level III Technician within the plant without being accompanied at all times.

Although Tolley appears to contend that Level III Technicians never are sent into the plant to work alone, he does not present any competent evidence in support of that contention other than his claim that he himself has never been sent to work in the plant alone, and that workers are "customarily" sent out to work in pairs for safety reasons. To the extent Tolley is requesting, as an accommodation, that he never be required to work alone and that he always have someone working with him who can read and explain the contents of the work package, such an accommodation would effectively excuse Tolley from performing some of what TVA has established are essential job functions, specifically, the ability to work independently and the ability to read and safely follow a written work package. "As a matter of law, it is an unreasonable accommodation for the employer to have to exempt the employee from performance of an essential function of the job." *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998) (holding that a nurse who was unable to subdue patients due to physical limitations

_____

[5] TVA has presented written documentation of the MST program requirements, as well as copies of portions of a typical work package that would be given to a Level III technician.

caused by disability was not otherwise qualified to perform nursing job she sought).  Further, "the law does not require an employer to transfer from the disabled employee any of the essential functions of his job."  *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997); *see also Benson v. Northwest Airlines, Inc.*, 62 F.3d 1108, 1112–13 (8th Cir. 1995) (noting that reallocating marginal functions to other employees can be a reasonable accommodation, but "[a]n employer need not reallocate the essential functions of a job").

It is clear that James Tolley is a highly skilled, motivated and intelligent individual who, because of a learning disability, has never been able to learn to read.  Unfortunately, however, Tolley has not presented evidence refuting or calling into question TVA's evidence that the ability to read is an absolutely essential function of the position of Level III Technician.  His assertions based on Dwight Phillips' experiences are irrelevant given that Phillips was never employed at Cumberland after adoption of the multiple-skills job classifications.  Likewise, although Tolley has certainly presented evidence indicating that he is fully capable of learning the various mechanical skills required of Level III Technicians, and likely could pass the required tests with lots of extra help, he has not presented competent evidence sufficient to create a disputed issue of fact as to whether the ability *safely* to work alone at times, unassisted and unsupervised, is a core requirement of a Level III Technician.

In short, the Rehabilitation Act does not obligate employers "to employ people who are not capable of performing the duties of the employment to which they aspire."  *Sutton v. Lader*, 185 F.3d 1203, 1211 (11th Cir. 1999).  Further, courts have repeatedly held that an employee whose condition or disability poses a significant risk to the health or safety of others that cannot be eliminated by a reasonable accommodation are not "otherwise qualified" for purposes of the statute.  *See, e.g.*, *Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998) (affirming summary judgment for the defendant employer on the grounds that an HIV-infected employee was not otherwise qualified for the position of operating room technician where his illness posed a significant threat to patients' safety); *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995) ("[A]n individual is not otherwise qualified if he poses a significant risk to the health or safety of others by virtue of the disability that cannot be eliminated by reasonable accommodation.").

This Court concludes based on the undisputed evidence that the ability to read is an essential

requirement for undergoing multi-skills training and, more importantly, an essential function of the position of Level III Technician. Tolley's inability to read renders him unqualified for the position he sought. Because he was not "otherwise qualified" for the position of Level III Technician, he cannot demonstrate that TVA discriminated against him on the basis of disability when it pulled him from the MST program and refused to allow him to proceed to the Level III position. Rather, TVA reasonably accommodated Tolley's disability at his present level—that of Level II Technician—by permitting him to remain at that position on a permanent basis rather than subjecting him to the generally applicable "up-or-out" requirement. TVA thus complied with what the Rehabilitation Act required it to do.

### B. Tolley Cannot Show that TVA Failed to Engage in Interactive Process

Tolley further contends that he was "forced" to sign the letter agreeing to remain at the Level II position with certain restrictions. He feels he was forced to sign the letter because the only alternative given him was that he lose his job altogether. The Court construes this allegation as a claim that TVA violated the Rehabilitation Act by failing to engage in an interactive process for the purpose of exploring whether a reasonable accommodation could be provided.

The ADA's regulations, which also apply to the Rehabilitation Act, indicate that, "[t]o determine the appropriate reasonable accommodation [for a given employee,] it may be necessary for the [employer] to initiate an informal, interactive process with the [employee]." 29 C.F.R. § 1630.2(o)(3). The purpose of this process is to "identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* Accordingly, "[t]he interactive process requires communication and good-faith exploration of possible accommodations." *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1114 (9th Cir. 2000) (en banc), *judgment vacated on other grounds*, 535 U.S. 391 (2002). The Sixth Circuit has recognized that, "[e]ven though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007) (citing *Barnett*, 228 F.3d at Id. at 1116).

TVA concedes that Tolley was told, at a certain point, that he had three days to sign the letter accepting the proposal that he remain in the Level II position with certain limitations or he would be fired. Tolley himself concedes, however, that this ultimatum came after a long series of meetings and

discussions.  He also admitted in his deposition that he had previously been given the opportunity to take the letter home and discuss it with his wife, who was then permitted to attend one of the later meetings between him and management regarding his situation.  Further, there is no dispute that Tolley was evaluated by a psychologist and optometrist and that Cumberland's "WET" team reviewed the results of these evaluations in light of the essential job functions of the Level III position before concluding that the best and safest accommodation would be to maintain Tolley as a Level II employee and to impose certain restrictions on him to ensure his safety and that of others working at the plant.  There are no material issues of disputed fact:  The evidence is clear that TVA complied with its obligation to engage in good faith in the interactive process, and to communicate directly with Tolley regarding his limitations and options at Cumberland.  TVA is entitled to judgment in its favor as to this claim as well.

IV.     CONCLUSION

For the reasons set forth above, the defendant's motion for summary judgment will be granted in its entirety and this matter dismissed.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge